FILED
Jun 24, 2026
08:51 AM(CT)
TENNESSEE COURT OF
WORKERS' COMPENSATION
CLAIMS



# TENNESSEE BUREAU OF WORKERS' COMPENSATION
## IN THE COURT OF WORKERS' COMPENSATION CLAIMS
## AT COOKEVILLE

| | |
|---|---|
| NENA BECKMAN,<br>        Employee,<br>v.<br>MANHEIM TENNESSEE, LLC,<br>        Employer,<br>and<br>AIU INS. CO.,<br>        Insurer. | Docket No. 2025-40-1275<br><br><br><br>State File No. 11613-2025<br><br><br>Judge Robert Durham |

## EXPEDITED HEARING ORDER GRANTING BENEFITS

This Court held an Expedited Hearing on June 1, 2026. Ms. Beckman requested temporary partial disability benefits from February 5, 2025, until she reaches maximum medical improvement, less the two weeks and two days of benefits that she already received. She also requested a panel of neurologists as recommended by her treating physician. For the reasons below, the Court awards Ms. Beckman temporary disability benefits and orders Manheim to provide the panel.

### History of Claim

Ms. Beckman was injured on February 4, 2025, when a sign fell on her head at work. The first authorized doctor she saw ordered that she avoid driving, and Manheim informed her that they could accommodate the restriction., but she would have to find a way to and from work. When she refused to attempt returning to work, Manheim terminated temporary disability benefits.

Ms. Beckman then filed a request for expedited hearing seeking benefits. The Court denied her request in June, citing *Francoeur v. Amerimed Medical Solutions, LLC*, TN Wrk. Comp. App. Bd. LEXIS 36, at *12 (Oct. 1, 2024) (traveling to and from work falls outside the scope of workers' compensation law, and Employers are not obligated to accommodate this restriction.)

Ms. Beckman later received authorized treatment from spine surgeon Dr. Robert Lowe. He ordered a cervical MRI, which revealed herniations and moderate to severe stenosis with possible impingement from C4-5 through C6-7. Dr. Lowe believed that the left-arm radicular pain was from the herniation and impingement at C5-6 and was primarily due to her work accident. He recommended surgery, but it was denied through utilization review. He restricted her from using her left arm overhead and lifting more than 15 pounds.

Regarding restrictions, Dr. Lowe testified that he does not usually request a job description. He places general limitations on physical activity and lets the employer decide if it can accommodate them. He admitted that he never had a clear idea of Ms. Beckman's actual job duties. When he assigned restrictions, he thought her job involved working at a car dealership and walking around the lot.

In July 2025, Ms. Beckman informed Dr. Lowe that she would have difficulty carrying her work equipment, which weighs eight to ten pounds, and that she was concerned about her ability to walk approximately ten miles per day. Based on her MRI and worsening symptoms, he revised her job restrictions on July 29 to no lifting more than ten pounds but did not restrict her from walking. Based on this restriction, Manheim returned Ms. Beckman to her job on August 5.

As for Ms. Beckman's job duties, Manheim conducts wholesale vehicle auctions. According to its job description, Ms. Beckman's work involved ensuring that all proper identification stickers and labels were attached to arriving vehicles. She also had to enter identification information into a tracking system, take pictures, direct transporters to the appropriate lot, and make sure the vehicles were placed in the proper order for sale.

Manheim stored the vehicles on various lots divided into zones. Ms. Beckman's job required her to go to her zone, either by walking, using designated transportation, or riding with another specialist. She would then walk over the lot to the location of each vehicle designated for sale. She would inspect the vehicle, enter information into a scanner weighing less than two pounds, and place a tag on the car. Ms. Beckman testified she also carried a "boost box" weighing seven to 12 pounds, which she used to restart vehicles if the batteries were dead. Once she finished her zone, she would then assist other specialists. Ms. Beckman said that the job required her to tag as many as 300 to 400 vehicles and walk six to eight miles daily.

Donna Smiley, lot manager in August, testified about her job duties. She said that they did not have to walk to their zone—cars or golf carts were available. Specialists could also use their car or cart inside a zone and did not have to walk the

2

entire time. The number of vehicles that had to be tagged varied from day to day. Carrying a boost box was unnecessary, since specialists could call a repair truck. They could also ask each other for help. If they needed rest, they could either sit in their vehicle or in one of the lot cars.

Both parties provided evidence about Ms. Beckman's work on August 5 and 6. Ms. Beckman testified that on the 5th, she walked to her zone because a car was unavailable. She also had to carry a boost box that weighed more than ten pounds. She estimated she walked six miles that day, and this activity along with reaching out to tag vehicles, greatly increased her neck and shoulder pain. She began work with a pain level of four, but by the end of the day her pain was at ten, and she could not look down to walk. She finished the day but was much slower than usual. She conceded that her supervisor told her they were not expecting 100% productivity from her in her injured condition.

The next day, someone picked up the vehicle she drove to her zone, and she had to walk back to the offices from the lot. She said she walked five miles that day while experiencing severe neck and shoulder pain. She also began having anxiety about her job performance and was upset that she could not do her job as before.

After half a day, Ms. Beckman told another supervisor that she couldn't continue working. The supervisor told her to go home and they would call her. She said they did not offer another job, although she called repeatedly asking about light duty. She asked Dr. Lowe to give more specific work restrictions, but he declined. She received a letter from Manheim in December terminating her and has not worked since.

Manheim maintains a light-duty program designed to accommodate any restriction. If it cannot find work within its departments, it will loan employees to charitable organizations. However, since Ms. Beckman only had a ten-pound lifting restriction, they believed she could return to full duty as a specialist. When she returned, they told her that they did not expect her to work at the same level as before the injury. They never criticized her or told her that she was in danger of termination based on job performance.

After she left, Manheim reached out multiple times asking her to return to work or obtain modified restrictions. They received multiple restriction updates but no information changing the ten-pound lifting restriction. If they had received amended restrictions, Manheim would have accommodated them.

After she stopped working, Ms. Beckman emailed Dr. Lowe about "having some anxiety" about returning to work. Dr. Lowe testified that the email said she could not walk or stand over the sink or walk to the mailbox. It also commented on the vagueness of the ten-pound lifting restriction. Dr. Lowe said the email was "challenging" to understand, and he responded, "I'm going to stick with my restrictions of no lifting over 10 pounds, and we'll see what happens."

Dr. Lowe noted that Ms. Beckman later told him that Manheim was unable to accommodate her restrictions. Despite this, he kept her on the same 10-pound lifting restriction and repeated this restriction in November when he was again asked for clarification.

In February 2026, Ms. Beckman's attorney wrote to Dr. Lowe and asked if it would be advisable for her to carry a boost box weighing eight to ten pounds for an "extended period of time." He also asked if Ms. Beckman should walk eight to ten miles a day given her condition. Dr. Lowe responded no to both.

In his deposition, Dr. Lowe admitted he did not know what a boost box is, what it weighs, or what an "extended period of time" means. He also did not know if Ms. Beckman's job actually requires her to walk eight to ten miles a day. However, if the job requirements described in the letter were accurate, he felt they were too much given her condition.

Dr. Lowe then gave more details about Ms. Beckman's restrictions. He said that a reasonable restriction for her was two hours' walking each day and alternate standing and sitting. He also felt Ms. Beckman could carry up to ten pounds for ten to 15 minutes per hour

On redirect, Dr. Lowe said that until he received the February letter from Ms. Beckman's attorney, he never received a specific, "actionable" request to adjust Ms. Beckman's restrictions. Thus, he did not have any reason to change her restrictions. He thought Ms. Beckman could have returned under the restrictions he gave her at the time "with the application of common sense on top of them," and that "he was agreeing with the [February] letter" from Ms. Beckman's counsel.

Finally, on the question of specialist treatment, Dr. Lowe said he referred Ms. Beckman to a neurologist to evaluate her headaches because she suffered a scalp injury.

**Findings of Fact and Conclusions of Law**

To obtain her requested benefits, Ms. Beckman must show a likelihood of proving she is entitled to them at a compensation hearing. Tenn. Code Ann. § 50-6-

239(d)(1) (2025).

Where the disability is not total, the employee may recover temporary partial disability benefits if the employee is able to resume some gainful employment but has not reached maximum recovery. *Frye v. Vincent Printing Co*., 2016 TN Wrk. Comp. App. Bd. LEXIS 34, at *15 (Aug. 2, 2016). Temporary restrictions given by a treating doctor "do not establish an entitlement to continued temporary benefits if the employee is able to work without loss of income." *Id*. at *16. It remains "the employee's burden in the first instance to prove her inability to return to work within her restrictions." *Id*.

*Frye* further states that if an employer makes a light-duty job offer, whether the employee is still entitled to temporary benefits "hinges on the reasonableness of the employer's actions in offering a light duty position and the reasonableness of the employee in declining the offer." *Id*. In determining reasonableness, the resolution "must rest upon the facts of each case[.]" Dennis *v. Polymer Components*, 2016 TN Wrk. Comp. App. Bd. LEXIS 47, at *11 (Sept. 27, 2016).

This case is unusual, in that neither Ms. Beckman nor Manheim made unreasonable decisions given the information available to them in real time. Manheim offered Ms. Beckman a job that was within the treating physician's restrictions and told her that she was not expected to work at the same level she did before her accident. When Ms. Beckman informed them that she could not walk long distances due to pain, Manheim repeatedly encouraged her to seek revised restrictions and said they would find work to accommodate them. They then waited several months before finally terminating her.

On the other hand, the Court credits Ms. Beckman's testimony about the level of pain caused by her attempted return to work; thus, her decision to refuse to return to work was also reasonable. Before she returned to work, she discussed with Dr. Lowe her concerns about her ability to perform her job duties. When he declined to assign restrictions against walking, she attempted to return to work despite having serious reservations. She worked for a full day and a half before deciding she could not continue because of the pain caused by working. She then tried to convince Dr. Lowe to revise her restrictions, but he again declined.

Here, Ms. Beckman's inability to return to work was not caused by unreasonable actions of either party, but by the fact that Dr. Lowe misapprehended Ms. Beckman's job duties. Dr. Lowe testified that he thought Ms. Beckman worked at a retail car dealership that might involve some walking along with other tasks. He

said her plea through email was "challenging," and it appears he believed she was exaggerating both her job duties and her symptoms. Thus, despite Ms. Beckman's requests, he refused to modify her restrictions until her attorney wrote to him clarifying Ms. Beckman's circumstances when she returned to work.

Considering the clarified facts, Dr. Lowe testified that that reasonable restrictions on Ms. Beckman's activities included two hours' walking each day and alternate standing and sitting. He also felt Ms. Beckman could carry up to ten pounds for ten to 15 minutes per hour.

The Court analogizes Dr. Lowe's revisions to cases where the treating doctor placed an employee at maximum medical improvement but then changed this designation when further treatment became necessary. *Beene v. Metro Servs., Inc.*, 2017 TN Wrk. Comp. App. Bd. LEXIS 1, at *7 (Jan. 12, 2017). In those situations, the employee is entitled to additional temporary disability benefits even though the employer was justified in ending benefits when the doctor originally assessed maximum medical improvement.

Given the restrictions above, the actual number of miles that Ms. Beckman had to walk each day and how much the boost box weighed is of little relevance. The undisputed evidence is that her job required her to be on her feet and walking for most of the workday. She also had to carry and manipulate equipment and repetitively use her hands for inputting information and tagging vehicles. Thus, regardless of the actual miles Ms. Beckman had to walk or how much the equipment weighed, she could not have performed the essential functions of her job under the above restrictions. The Court finds Ms. Beckman was reasonable in refusing to incur severe pain by trying to continue working.

As for the amount of benefits owed, Manheim did not produce any evidence that it offered to return Ms. Beckman to work after it became aware of Dr. Lowe's revised restrictions, nor is she yet at maximum medical improvement.

Thus, Ms. Beckman has shown she is likely to prevail at a hearing on the merits that she is entitled to temporary partial disability benefits. These benefits shall continue until Ms. Beckman reaches maximum medical improvement or is able to return to work.

Finally, the undisputed evidence is that Dr. Lowe, as the treating physician, referred Ms. Beckman to a neurologist for her continuing headaches. Under section

50-6-204(a)(3)(A)(ii), Manheim shall provide a panel of neurologists from which Ms. Beckman may choose a treating doctor.

IT IS ORDERED:

1. Manheim shall pay temporary partial disability benefits from February 5, 2025, less any temporary disability benefits and wages already paid, to the present and ongoing. At a compensation rate of $431.71, the lump-sum amount is $31,021.45, less benefits already paid. Ms. Beckman's counsel is entitled to a 20% attorney's fee.

2. Manheim shall provide a panel of neurologists from which Ms. Beckham may choose a treating doctor.

3. This case is set for a status conference/scheduling hearing on **August 10, 2026**, at **10:30 a.m. Central Time**. The parties must call 615-253-0010 or 855-689-9049. Failure to call might result in a determination of the issues without the party's participation.

4. Unless appealed, compliance with this order must occur by seven business days of entry of this order under Tennessee Code Annotated section 50-6-239(d)(3).

ENTERED June 24, 2026.

_____
**JUDGE ROBERT DURHAM**
**Court of Workers' Compensation Claims**

**APPENDIX**

Exhibits:
1. Wage Statement
2. Dr. Lowe's deposition with attached records
3. Collective medical records
4. Ms. Beckman's Rule 72 statement
5. Termination letter
6. Job description
7. Affidavit of Deonna Walker

**CERTIFICATE OF SERVICE**

I certify that a copy of this Order was sent on June 24, 2026.

| Name | Via Email | Service sent to: |
|---|---|---|
| Chris Markel, Employee's attorney | X | cmarkel@markelfirm.com |
| Teri Bernal, Employer's attorney | X | tbernal@hennessyroach.com |

_____
**PENNY SHRUM, COURT CLERK**
wc.courtclerk@tn.gov



<u>Right to Appeal</u>:

If you disagree with the Court's Order, you may appeal to the Workers' Compensation Appeals Board. To do so, you must:

1. Complete the enclosed form entitled "Notice of Appeal" and file it with the Clerk of the Court of Workers' Compensation Claims before the expiration of the deadline.
    ➢ If the order being appealed is "expedited" (also called "interlocutory"), or if the order does not dispose of the case in its entirety, the notice of appeal *must* be filed *within seven (7) business days* of the date the order was filed.
    ➢ If the order being appealed is a "Compensation Order," or if it resolves all issues in the case, the notice of appeal *must* be filed *within thirty (30) calendar days* of the date the Compensation Order was filed.
    When filing the Notice of Appeal, you must serve a copy on the opposing party (or attorney, if represented).

2. You must pay, via check, money order, or credit card, a **$75.00 filing fee** *within ten calendar days* after filing the Notice of Appeal. Payments can be made in-person at any Bureau office or by U.S. mail, hand-delivery, or other delivery service. In the alternative, you may file an Affidavit of Indigency (form available on the Bureau's website or any Bureau office) seeking a waiver of the filing fee. You must file the fully-completed Affidavit of Indigency *within ten calendar days* of filing the Notice of Appeal. **Failure to timely pay the filing fee or file the Affidavit of Indigency will result in dismissal of your appeal.**

3. You are responsible for ensuring a complete record is presented on appeal. If no court reporter was present at the hearing, you may request from the Court Clerk the audio recording of the hearing for a $25.00 fee. If you choose to submit a transcript as part of your appeal, which the Appeals Board has emphasized is important for a meaningful review of the case, a licensed court reporter must prepare the transcript, and you must file it with the Court Clerk. The Court Clerk will prepare the record for submission to the Appeals Board, and you will receive notice once it has been submitted. For deadlines related to the filing of transcripts, statements of the evidence, and briefs on appeal, see the applicable rules on the Bureau's website at https://www.tn.gov/wcappealsboard. (Click the "Read Rules" button.)

4. After the Workers' Compensation Judge approves the record and the Court Clerk transmits it to the Appeals Board, a docketing notice will be sent to the parties.

    **If neither party timely files an appeal with the Appeals Board, the Court Order becomes enforceable. See Tenn. Code Ann. § 50-6-239(d)(3) (expedited/interlocutory orders) and Tenn. Code Ann. § 50-6-239(c)(7) (compensation orders).**

*For self-represented litigants: Help from an Ombudsman is available at 800-332-2667.*



# NOTICE OF APPEAL

Tennessee Bureau of Workers' Compensation
www.tn.gov/workforce/injuries-at-work/
wc.courtclerk@tn.gov | 1-800-332-2667

**Docket No.:** _____

**State File No.:** _____

**Date of Injury:** _____

_____

**Employee**

v.

_____

**Employer**

Notice is given that _____

*[List name(s) of all appealing party(ies).  Use separate sheet if necessary.]*

appeals the following order(s) of the Tennessee Court of Workers' Compensation Claims to the Workers' Compensation Appeals Board (check one or more applicable boxes and include the date file-stamped on the first page of the order(s) being appealed):

☐ Expedited Hearing Order filed on _____    ☐ Motion Order filed on _____

☐ Compensation Order filed on_____    ☐ Other Order filed on_____

issued by Judge _____.

## Statement of the Issues on Appeal

Provide a short and plain statement of the issues on appeal or basis for relief on appeal:

_____
_____
_____
_____

## Parties

**Appellant(s)** (Requesting Party): _____ ☐ Employer ☐ Employee

Address: _____ Phone: _____

Email: _____

Attorney's Name: _____ BPR#: _____

Attorney's Email: _____ Phone: _____

Attorney's Address: _____

*\* Attach an additional sheet for each additional Appellant \**

Employee Name: _____ Docket No.: _____ Date of Inj.: _____

**Appellee(s)** (Opposing Party): _____ ☐ Employer ☐ Employee

Appellee's Address: _____ Phone: _____

Email: _____

Attorney's Name: _____ BPR#: _____

Attorney's Email: _____ Phone: _____

Attorney's Address: _____

*\* Attach an additional sheet for each additional Appellee \**

### CERTIFICATE OF SERVICE

I, _____, certify that I have forwarded a true and exact copy of this Notice of Appeal by First Class mail, postage prepaid, or in any manner as described in Tennessee Compilation Rules & Regulations, Chapter 0800-02-21, to all parties and/or their attorneys in this case on this the _____ day of _____, 20 _____.

_____
*[Signature of appellant or attorney for appellant]*